JOHN PANKO, PLAINTIFF-RESPONDENT, v. FLINTKOTE CO., A CORPORATION, THE LUMMUS COMPANY, A CORPORATION, DEFENDANTS, AND BUHL & CAFFREY, A CORPORATION, DEFENDANT-APPELLANT.

Argued February 19, 1951—Decided April 30, 1951.

*Mr. John W. Hand* argued the cause for the appellant (*Messrs. Evans, Hand & Evans,* attorneys).

*Mr. Meyer M. Semel* argued the cause for the respondent.

The opinion of the court was delivered by

ACKERSON, J.   On July 2, 1948, the Flintkote Company was the owner of a building, referred to as the "Liquid Storage Plant," then in the final stages of construction.   The Lummus Company, as general contractor for the owner, had subcontracted the electrical work to Buhl & Caffrey, Inc.   On that day the plaintiff, John Panko, an employee of The Nutley Window Cleaning Company, which had been engaged by the owner to clean the windows in the building, fell from a bank or bay of windows to the floor below sustaining severe personal injuries.   He claims his fall was caused by electric shock transmitted to him when one strand of a group of three insulated electric wires parted at the point where they were temporarily run over the top edge of a steel window frame

where he was working. He instituted this action in the Superior Court, Law Division, against the owner, general contractor and subcontractor charging that his injuries were due to the negligence of one or more of them in the construction and maintenance of the temporary wiring.

At the close of the plaintiff's case the defendants moved for judgment in their favor and it was granted as to the owner, Flintkote Company and its general contractor, The Lummus Company, but denied as to Buhl & Caffrey, Inc., the subcontractor, and the trial proceeded against that company alone. At its close the last-named defendant again moved for judgment which was likewise denied. The jury returned a verdict in favor of the plaintiff in the amount of $60,000 and, from the judgment entered thereon, Buhl & Caffrey, Inc. appealed to the Appellate Division of the Superior Court, and, while pending there, the appeal was certified here on our own motion.

It is now contended that the trial court erred in denying the last-mentioned motion for judgment for the reason that the evidence failed to show any negligence on the part of Buhl & Caffrey, Inc., and that, in any event, the parting of the wire under the circumstances exhibited was not the proximate cause of the accident complained of.

Our examination of the record leads us to the conclusion that the trial court did not err in denying the aforesaid motion and submitting the issues involved to the jury. However, as the judgment below must be reversed on another ground about to be considered, and the case may be retried, we refrain from discussing the evidence which leads to our conclusion that the motion was properly denied.

The further ground of appeal above referred to concerns the validity of the verdict below because of the misconduct of a juror.

The trial began on Monday, May 29, and ended June 2, 1950, with no session on Decoration Day. On Thursday, June 1, defendant's counsel was informed by its president, Joseph Buhl, that on the evening of May 30 the latter had

received at his home a telephone call from a Mr. Smith, whom he knew, inquiring as to the amount of liability insurance carried by the defendant corporation and that, during the course of the conversation which ensued, Smith was told the company carried $250,000 insurance for one accident. It was later ascertained that Smith is a brother-in-law of one of the jurors on the panel in the instant case. Thereupon counsel gave this information to the trial judge, in the presence of plaintiff's counsel, at the same time stating that he would ask for a mistrial if it appeared there was any contact between the particular juror and Smith at or about the time of the aforementioned telephone conversation. Upon agreement of counsel, the juror was interrogated alone by the trial judge in chambers. The juror denied any knowledge of the telephone call by Smith to Buhl, but said that he, the juror, had talked with his brother-in-law, Smith, *over the telephone* on *Monday, May* 29, during the course of which he, the juror, had alluded to the fact that he was sitting in the trial of a case, mentioning the character thereof and the names of the parties thereto as he remembered them, but had gone no further than that. The trial judge then permitted him to return to the panel and informed counsel of the juror's explanation, at the same time indicating the judge's belief therein and that a mistrial was not warranted. Accordingly, no motion for a mistrial was made and no objection was taken by either party to the court's action and the trial was resumed and completed with the result already indicated.

However, shortly after the completion of the case, defendant's president, Buhl, learned for the first time from Smith that on the evening of May 30, Smith and his wife had visited the juror and his wife *at the juror's home* and it was on that occasion the discussion relative to the instant case had taken place between Smith and the juror, and not on May 29, over the telephone, as the juror had previously told the court. He was further informed that Smith had made the telephone call to him regarding his company's insurance from the juror's house on the same evening.

Incorporating the foregoing circumstances in affidavit form, defendant applied to the trial court for a new trial on the ground, *inter alia,* that the juror was guilty of misconduct which vitiated the verdict. Depositions were thereupon taken on both sides and the motion was eventually denied, and it is this result which now engages our attention.

Smith, in his deposition, substantially confirms the foregoing recital of events. He testified that he and his wife arrived at the juror's home at 9 o'clock in the evening of May 30 and remained there until about midnight; that during the evening the instant case was discussed with the juror, and while there Smith telephoned Buhl to find out if he had "plenty of insurance." Smith says, however, that he made the call on his own initiative from the den in the rear of the house while the juror was upstairs shaving, and made no mention of it to him until questioned by the juror on the Saturday following the trial. The juror (in his deposition offered by way of exculpation) admits talking about the case with his brother-in-law on the evening of May 30 under the circumstances above related, but says that he did not know of Smith's telephone call to Buhl and was upstairs shaving when Smith says the call was made (10 minutes after 10 o'clock) and did not come down again to his guests for half an hour.

The fact remains, however that the telephone call was made by Smith from the juror's home long before the evening's visit was over and after they had discussed certain details of the case. No rational explanation for the call is given, but the inference is inescapable that it was made for the purpose of getting information which would have a bearing on the verdict in the pending case, undoubtedly to ascertain how high the verdict could go without exceeding the amount of insurance carried by Buhl's company for its protection. This ulterior motive, however, was unknown to Buhl and his company, and was without their solicitation. It is beyond belief that, having secured the desired information, Smith did not communicate it to his brother-in-law during the consider-

able time they remained together in the house thereafter. In this connection we note the discrepancy between the juror's statement to the trial judge during the trial as to the time, place and method of his conversation with Smith regarding the case, and that contained in his later deposition, as reflecting upon his credibility. The situation thus presented has serious implications, at least so far as this juror's fairness and impartiality are concerned, which should not be condoned, since it reflects discredit and suspicion on the purity of the administration of justice in general.

The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. A jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge, based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. A jury can act only as a unit and its verdict is the result of the united action of all the jurors who participated therein. Therefore, the parties to the action are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences. *Payne v. Burke,* 236 *App. Div.* 527, 260 *N. Y. S.* 259 (*N. Y. App. Div.* 1932) ; *Clyde Mattox v. United States,* 146 *U. S.* 140, 13 *S. Ct.* 50, 150, 36 *L. ed.* 917 (1892) ; 66 *C. J. S., New Trial,* § 47, *p.* 162 ; *Ibid.* § 61, *p.* 188.

It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all

suspicion of corrupting practices. It is said to be "imperatively required to secure verdicts based on proofs taken openly at the trial, free from all danger by extraneous influences." *Lamphear v. MacLean,* 176 *App. Div.* 473, 162 *N. Y. Supp.* 432 (*N. Y. App. Div.* 1916); *Gall v. N. Y. & New Brunswick Auto Express Co.,* 132 *N. J. L.* 466, 468 (*E. & A.* 1944); *In re Phelan,* 126 *N. J. L.* 410, 411 (*Sup. Ct.* 1941); *Den ex dem. Cox v. Tomlin,* 19 *N. J. L.* 76, 80 (*Sup. Ct.* 1842); *Consumers Coal Co. v. Hutchinson,* 36 *N. J. L.* 24, 26, 28 (*Sup. Ct.* 1872); *Sloan v. Harrison,* 1 *N. J. L.* 123 [Reprint page 145] (*Sup. Ct.* 1792); *In re Collins,* 18 *N. J. Misc.* 492, 497 (*Cape May Cty. Cir. Ct.* 1940); *York v. Wyman,* 115 *Me.* 353, 98 *A.* 1024 (*Me. Sup. Jud. Ct.* 1916); 39 *Am. Jur., New Trial,* § 96, *p.* 111.

Plaintiff argues, of course, that ten of the other jurors denied knowing anything about the insurance until after the trial, but if knowledge of the amount of the insurance influenced the juror in question there was not a fair trial. Furthermore, it is impossible to say what influence the argument and personality of that juror, motivated by such knowledge, may have exerted upon his fellow jurors during their deliberations, even if he did not disclose the amount of the defendant's insurance coverage. We think, however, it was a factor which entered into the result although we express no opinion as to whether or not the verdict is excessive because of our view that there must be a new trial. In order that there may be confidence in trial by jury it is necessary that parties are to feel sure that verdicts are based upon an honest consideration of the evidence and not upon prejudice or sympathy.

An application for a new trial is, of course, addressed to the sound legal discretion of the court and ordinarily will not be granted unless, after examination of the whole case, it appears the error injuriously affected the substantial rights of a party. However, where, as here, a new trial is sought because of the misconduct of a juror, another factor is involved, and the motion should be determined "with a view, not so much to the attainment of exact justice in the par-

ticular case, as to the ultimate effect of the decision upon the administration of justice in general." *Consumers Coal Co. v. Hutchinson, supra, p.* 26; *In re Collins, supra, p.* 497. However, the trial judge, in his opinion denying the motion, apparently failed to consider the last mentioned factor, and the record does not disclose sufficient reason, in the proper exercise of discretion, for upholding a verdict so tainted with suspicion as to reflect unfavorably upon the due administration of justice.

The judgment below is accordingly reversed and the cause remanded for a trial *de novo*.

*For reversal*—Chief Justice VANDERBILT and Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—6.

*For affirmance*—None.