211 N.J. Super. 602 (1986)
512 A.2d 531
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SHARON WEILER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 11, 1986.
Decided July 3, 1986.
*604 Before Judges FRITZ, GAYNOR and BAIME.
Roy B. Greenman argued the cause for appellant (Thomas S. Smith, Jr., Acting Public Defender, attorney; Roy B. Greenman, of counsel and on the brief.)
Marijean Raffetto Stevens, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Marijean Raffetto Stevens, of counsel and on the brief.)
The opinion of the court was delivered by BAIME, J.A.D.
*605 Defendant, John Flaherty and Charles Draper were charged in a multi-count indictment with conspiracy and murder in contravention of N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3, respectively. In addition, defendant alone was charged with two counts of attempted murder in violation of the provisions of N.J.S.A. 2C:5-1a(2) and N.J.S.A. 2C:11-3. Prior to trial, Draper was granted use immunity and agreed to testify for the prosecution. Following a protracted jury trial, defendant was found guilty of all of the charges. At sentencing, the trial judge merged the convictions[1] and imposed a term of life imprisonment. Defendant was ordered to serve 25 years without parole eligibility. After filing a notice of appeal, defendant applied for a remand in order to move for a new trial based upon newly discovered evidence. We granted defendant's application and retained jurisdiction. Defendant's motion for a new trial was subsequently denied.
The salient facts are as follows. The charges and resulting conviction stem from defendant's alleged participation in a plot to kill her husband. Defendant married Michael Weiler in 1970. The couple initially resided in California, but ultimately returned to New Jersey where they assumed ownership of her parents' store. One child was born of the marriage, Michael Weiler, Jr. The relationship between defendant and her husband was often acrimonious and stormy. In December 1978 defendant requested a divorce.
According to the State's witnesses, the bitter marital litigation that ensued ultimately led defendant to seek to have her husband murdered. Although questions relating to equitable distribution and support were hotly contested, defendant's principal concern pertained to the issue of custody. The State contended that defendant eventually formulated the idea of *606 having her husband killed to insure that she would be awarded custody.
In December 1978 defendant commenced living with Robert Hupperich. On several occasions, defendant told Hupperich that she "would like to see [her husband] dead...." At one point, defendant allegedly suggested to Hupperich that she would pay him $10,000 if he would kill her husband. During the course of the trial, the State presented additional witnesses who testified that defendant had solicited them to kill the victim.
In July 1979 defendant began having an affair with Draper. Defendant frequently discussed her marital problems with Draper and often requested his assistance in having her husband killed. Draper testified that defendant became "obsessed with [this] idea."
The relationship between defendant and Draper gradually deteriorated. In October 1980 defendant moved out of Draper's apartment and began living with a friend, Carol Wagener. Draper became infuriated and attempted to forcibly remove defendant from Wagener's residence. As Draper was driving defendant from Wagener's house, a police car intercepted his vehicle. Draper was arrested and subsequently charged with terroristic threats, kidnapping and breaking and entering. Although Draper and defendant later resolved their differences, she allegedly threatened to pursue the charges against him unless he found someone to kill her husband.
Draper then contacted Flaherty who agreed to murder the victim for $10,000. Flaherty subsequently obtained a shotgun. On November 8, 1980 Draper telephoned Flaherty and told him to kill Weiler soon because of the upcoming divorce hearing. During their conversation, Draper agreed to show Flaherty the victim's house and the surrounding area. Shortly thereafter, Draper pointed out the Weiler house and Flaherty described his plan to kill the victim. Draper subsequently advised defendant of the details of the plan.
*607 On November 11, 1980 Flaherty notified Draper that he would kill Weiler later that evening. Draper subsequently drove Flaherty, who was armed with a shotgun, to the vicinity of Weiler's house. Weiler was killed by a single shotgun blast that night.
Draper later quarreled with Wagener. During the altercation, Wagener was slightly injured. She subsequently filed charges against Draper. Several days later, Draper was arrested and, when confronted with defendant's statement which corroborated Wagener's account of the incident, confessed to his participation in the killing of Weiler. He later provided the police with a tape recording he had surreptitiously made of a conversation with defendant and Wagener wherein the need to pay Flaherty was discussed. He also assisted the police in retrieving the murder weapon from the river in which it had been disposed. Defendant was arrested on the next day.
Defendant elected to testify at trial. During her testimony, she recounted her problems with her deceased husband and the marital litigation which followed their separation. Defendant freely admitted telling numerous individuals that she hated her husband and wished he were dead. According to her testimony, she and her friends would frequently fantasize about plots to kill Weiler.
Defendant testified that she often discussed her marital problems with Draper. She stated that she spoke to Draper in jest about the possibility of killing her husband. At one point, Draper "offered to have the mob take care" of Weiler. According to defendant's testimony, Draper subsequently confessed that he had killed Weiler "for [her] ... because [she] wanted it done."
The jury returned its verdict and found defendant guilty. Flaherty was acquitted. Subsequent to the verdict and sentence, the trial judge learned of certain statements that had been made to a juror by a court officer before and during deliberations. On June 18, 1982 the judge interviewed the *608 juror, Diana Farinelli, in camera. Farinelli explained that Barbara Seuff, a court officer whom she befriended during the course of the trial, had telephoned her after the jury had recessed during deliberations. During the course of their conversation, Seuff told her that "the handwriting [was] on the wall" and that Flaherty was guilty. Seuff went on to say that defendant was also guilty, but according to Farinelli, she was more equivocal in that regard. When Farinelli attempted to abort the conversation, Seuff continued to implore her to find Flaherty guilty, noting that she was her "friend" and could be "trusted." After the discussion terminated, Farinelli contacted another juror and recounted her conversation with Seuff.
Following his interview with Farinelli, the trial judge apprised counsel of what had occurred. Thereafter, all of the jurors were questioned. Farinelli essentially repeated her prior account of the telephone conversation with Seuff. She further stated that she told another juror about Seuff's statement, but it is undisputed that the two did not discuss the matter with any of the other jurors until after the verdict had been rendered.
Other jurors described additional derelictions by Seuff during the course of the trial. During several recesses, Seuff demeaned defendant's attorney depicting him as "clumsy" and lacking in ability. One of the jurors noted in her statement and testimony that Seuff told her defense counsel was "lying," that he was "intentionally ... [acting] to get to the jury" and that "it was all put on." Several of the jurors testified that Seuff told them both defendant and Flaherty were guilty. According to their testimony, Seuff explained that she "knew more" about the case than they did because she was able to observe proceedings out of their presence. Seuff told one of the jurors that "[i]f [the jury] only knew what happened a week ago or during times when [they] were in recess [they] would know all three were guilty."
In addition to Seuff's derelictions, several of the jurors described unauthorized visits they had made to the scene of the *609 murder during the course of the trial. Specifically, three jurors drove to the victim's home and another unsuccessfully attempted to trace the path from Flaherty's trailer. Five other jurors were made aware of these trips.
The trial judge thoroughly questioned all of the jurors pertaining to the impact of Seuff's statements and the unauthorized viewing of the murder scene. In response, the jurors disavowed any suggestion that they were influenced by these events. According to the jurors, Seuff's opinions and comments were completely disregarded during their deliberations.
Following his interviews with the jurors, the trial judge denied defendant's motion in a letter opinion. In the course of his opinion, the judge acknowledged that "irregularities occurred in two ways prior to delivery of the verdict of the jury, i.e. improper conduct by the court attendant and the effort by some jurors to gain information by personally viewing certain areas." Nevertheless, the judge found that Seuff's misconduct "did not have the capacity and did not, in fact, affect the verdict." In support of his conclusion, the judge observed that Seuff's comments "were primarily directed against the defendant, Flaherty," who was ultimately acquitted. He also noted that "when [Seuff's] statements were made, the jurors either attached no significance to them or regarded [the officer] as merely an intermeddler who should be and was ignored." Finally, the judge determined that the unauthorized visits to the murder scene, although improper, had no impact on the jury's deliberations. Based upon these findings, the judge concluded that the interests of justice did not require a new trial. Defendant's motion was denied.

I
We disagree with the trial judge's conclusions and are constrained to reverse. It is well settled that the test for determining whether a new trial will be granted because of juror misconduct or intrusion of irregular influences is whether *610 such matters "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951). A jury's verdict "must be obedient to the court's charge, based solely on legal evidence ... and entirely free from the taint of extraneous considerations and influences." Ibid. Whenever prejudicial information which has the capacity to so undermine the verdict has been brought to the attention of any jurors, and the ill effects either have not been cured by the trial judge or cannot fairly be eradicated with instructions, "a party has not had a fair trial and is entitled to another day in court." Brandimarte v. Green, 37 N.J. 557, 563 (1962). "If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect." Panko v. Flintkote Co., supra, 7 N.J. at 61. See also Palestroni v. Jacobs, 10 N.J. Super. 266, 271 (App.Div. 1950). Stated another way, "[t]he test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Panko v. Flintkote Co., supra, 7 N.J. at 61.
The stringency of this rule is not a mere formalism. Palestroni v. Jacobs, supra, 10 N.J. Super. at 271. Rather, it is "imperatively required to secure verdicts based on proofs taken openly at the trial free from all danger of extraneous influences." Ibid. quoting Lamphear v. MacLean, 176 App.Div. 473, 162 N.Y.S. 432 (1916). The rule is founded on the sanctity of the jury system, State v. Doty, 32 N.J.L. 403, 406 (Sup.Ct. 1868), and "is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices." Panko v. Flintkote Co., supra, 7 N.J. at 61-62. The principle has long been applied in New Jersey. See, e.g., State v. Kociolek, 20 N.J. 92, 96-105 (1955); State v. Vaszorich, 13 N.J. 99, 114 (1953), cert. den. 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953); State v. Auld, 2 N.J. 426, 432 (1949); State v. Sachs, 69 N.J. Super. 566, 588 (App.Div. 1961); Kavanaugh v. Quigley, 63 N.J. Super. 153, 161-162 (App.Div. *611 1960); Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332, 340 (App.Div. 1956).
We are firmly convinced from our thorough review of the record that Seuff's blatant misconduct had the clear and undeniable capacity to influence the jury in arriving at its verdict. The official conduct which is the predicate of this appeal profoundly shocks the judicial conscience. Seuff's interference in the jury's deliberative process constituted a brazenly lawless attempt to seek a conviction at the expense of fundamental individual rights. Seuff was a law enforcement officer and it is reasonable to say that jurors would naturally repose confidence in her. In her statements to the jurors, she did not merely refer to the evidence presented. Rather, she expressed her personal knowledge of defendant's guilt. Seuff conveyed the idea that her opinion was partially based upon her expertise inherent in her position as a sheriff's officer. Most significantly, she unequivocally stated that her knowledge was also predicated upon observations made in proceedings in which she, but not the jury, was in attendance. Cf. State v. Farrell, 61 N.J. 99, 103 (1972); State v. Thornton, 38 N.J. 380, 398 (1962), cert. den. 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963). Although the jurors stated that they were unaffected by Seuff's misconduct, they failed to report it to the trial judge despite their recognition of its significance. One juror expressed grave concern with regard to the fairness of the proceedings and stated that defendant should be granted a new trial.
While we do not predicate our decision on constitutional grounds, we note that the United States Supreme Court has found due process violations in cases involving far less egregious circumstances. In Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), defendant challenged the validity of his conviction for murder on the basis that "a court bailiff assigned to shepherd the sequestered jury ... stated to one of the jurors in the presence of others" that the accused *612 was guilty. 385 U.S. at 364, 87 S.Ct. at 470, 17 L.Ed.2d at 422. On another occasion, the bailiff said to a different juror that "[i]f there is anything wrong [in finding defendant guilty] the Supreme Court will correct it." Ibid. The Court held that the statements of the bailiff violated the "[c]ommand of the Sixth Amendment, made applicable to the States through the [d]ue [p]rocess [c]lause of the Fourteenth Amendment." 385 U.S. at 364, 87 S.Ct. at 470, 17 L.Ed.2d at 422. In the course of its opinion, the Court observed that "the unauthorized conduct of the bailiff `involve[d] such a probability that prejudice [would] result that it is deemed inherently lacking in due process.'" 385 U.S. at 365, 87 S.Ct. at 470, 17 L.Ed.2d at 423 quoting Estes v. Texas, 381 U.S. 532, 542-543, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543, 550 (1965). See also Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).
In our view, the interests of justice mandate that defendant be given a new trial. Of course, we do not overlook the conscientious efforts made by the trial judge to protect and safeguard defendant's rights. Nevertheless, we are fully convinced that the misconduct of the sheriff's officer had the clear capacity to prejudice defendant in the eyes of the jury. The jurors' words alone are "too weak a reed" upon which to rest the difficult question of whether the verdict was subject to improper influence and tainted thereby. See Palestroni v. Jacobs, supra, 10 N.J. Super. at 273. We, thus, hold that defendant is entitled to a new trial.

II
Defendant's other arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2). Specifically, we are entirely unpersuaded by defendant's contentions that: (1) the trial judge committed plain error in failing to instruct the jury on the lesser included offenses of aggravated manslaughter and manslaughter, (2) the judge should have sua sponte adjourned the trial because of defendant's illness, (3) *613 defendant's trial counsel did not adequately represent her, (4) the judge erred in permitting cross-examination of defendant's former matrimonial attorney, (5) the tape recorded conversation between Draper, Wagener and defendant was erroneously admitted, (6) the judge should have granted defendant's motion for psychiatric tests of Draper, (7) rebuttal testimony was erroneously permitted, (8) testimony relating to defendant's sexual activities and drug abuse was improperly admitted and constituted plain error, (9) defendant's sentence was excessive and (10) the judge erred when he admitted a report relating to the probation department's investigation of defendant's fitness as a parent. We are also unpersuaded by defendant's argument set forth in her pro se brief that the judge failed to adequately apprise the jury of her factual contentions in his instructions.
We need comment only with respect to defense counsel's final argument relating to admission of the probation department report. As part of her defense, defendant introduced a report prepared by a psychiatrist who had been appointed by the court in the divorce litigation to assist in resolving the question of custody. In the report, the psychiatrist recommended that defendant, and not her husband, be awarded custody. The report was relevant to rebut the State's thesis that defendant had her husband murdered because she believed that he would otherwise be awarded custody of their son. The State was, thereafter, permitted to introduce the probation department's report which was highly critical of defendant and recommended that her husband be given custody of Michael.
We find no merit in defendant's argument that admission of the probation department's report constituted prejudicial error, particularly in light of the trial judge's emphatic limiting instructions concerning the probative effect of this evidence. Since this case must be retried, however, we strongly suggest that various hearsay statements contained in the report be excised prior to its admission. We do not know whether, and *614 under what circumstances, the State might seek to introduce the report. We merely emphasize that steps should be taken to redact irrelevant material contained in the report in the event that it is admitted.
The judgment of conviction is reversed and the matter is remanded for a new trial.
NOTES
[1] The State has not filed a cross-appeal from this determination. We, thus, have no occasion to determine whether the convictions were properly merged.