**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2029-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RASHAD A. ZEIGLER,
a/k/a TAJ HARDEN, and
RASHAD NIGHT,

     Defendant-Appellant.

_____

Argued March 13, 2025 – Decided March 20, 2025

Before Judges Mawla, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 19-07-1946.

Ashley Brooks, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ashley Brooks, of counsel and on the briefs).

Lucille M. Rosano, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

PER CURIAM

Defendant Rashad A. Zeigler appeals from his convictions for: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1) and 2C:15-1; first-degree robbery, N.J.S.A. 2C:15-1(a)(1); and first-degree felony murder, N.J.S.A. 2C:11-3(a)(3). He also challenges his sentence. We affirm.

On the evening of April 27, 2019, defendant was driving around Newark with his friend, Brian K. Wormley, Jr., in Wormley's Jeep. Defendant stopped, exited the vehicle to talk to a group of people, and reentered the Jeep with another friend, a man identified only as "Little Bro." Although Wormley did not know that man, defendant vouched for him, saying, "[h]e's good." Defendant told Wormley they were going to buy some pain pills, drove to South Ninth Street and South Orange Avenue, and pulled up near a black Honda. Little Bro exited the car and opened the Honda's driver's door. Seconds later, defendant also exited the Jeep, opened the Honda's front passenger door and began rummaging through the car.

Moments later, Wormley heard a commotion and exited his Jeep. He then heard four or five gunshots. The lone occupant of the Honda, Rahman Branch, was killed. Medina Gibson, the registered owner of the vehicle, and her seventeen-year-old son were also present, but were not in the car. Gibson's son

told police he tried to enter the Honda, but an armed individual blocked his way and told him to get back.

Defendant and Little Bro reentered Wormley's Jeep and told him to drive away. Wormley dropped the pair off at Eleventh Avenue and Littleton Avenue.

Police recovered footage from a security camera near the intersection of South Ninth Street and South Orange Avenue and were able to identify the Jeep. Two days later, detectives pulled Wormley over and asked him to come to the prosecutor's office for questioning. Wormley identified defendant as the man at the Honda's passenger door but said he did not know Little Bro. He described Little Bro as being in his early twenties, wearing a gray hoodie, and "[l]ight-skinned" with a "low haircut."

Wormley said when they arrived at the Honda, Little Bro approached the car the victim was in and "start[ed] robbing him." He did not see a gun until Little Bro approached the Honda. Defendant then ran from the Jeep to the Honda as well. After hearing the shots, Wormley got out of the Jeep's passenger side and went around to the driver's side; defendant and Little Bro ran back to the Jeep and told Wormley to "pull off." Little Bro had a gun when he returned to the Jeep.

A-2029-22

Wormley gave detectives his cell phone and consented to a search. He did not come forward sooner because he

> was so scared . . . because . . . [defendant] know[s] where my girlfriend lives. He know[s] the areas I be in. If you look at my . . . phone history, that night that that happened, I called him [fifty], [sixty] times because I was so scared and asking him what the f[***]. . . . I told you, bro. I—I don't want no parts—out of my car? I'm the first person this s[**t is] going to come back to. It's my f[***]ing car.

Wormley told detectives he heard defendant was a member of the Bloods gang.

Detectives showed Wormley a photo array. He picked out defendant from the array.

Gibson and her son also gave statements to detectives. Investigators learned Branch was Gibson's friend. Branch contacted her earlier in the day and she drove to his house to pick him up with her son in the car. Branch sat in the back seat.

Gibson dropped her son off on Ninth Street sometime around 5:30 or 6:00 p.m. Gibson's son told detectives he often goes there to visit family, and that evening he was outside the apartment complex on South Ninth Street with his cousin. After dropping her son off, Gibson and Branch went to a gas station and afterwards drove to Branch's house, then to Seventeenth Street.

4

Gibson recalled Branch got a phone call at some point, but she did not know who had called, or what the call was about. At Seventeenth Street, she saw a man give Branch money he seemed to owe him, then Gibson drove Branch to Twentieth Street. There, Gibson saw multiple people, one of whom she recognized as "Yab[,]" a man she saw "in the car all the time on [Sixth] Street." As Gibson and Branch left, Yab "was standing on the curb on the phone[,]" which bothered her. She also observed a man her niece called "D-Money" that she frequently saw on Sixth Street. Gibson was surprised to see D-Money there, since he was usually on Sixth Street, but Branch said he recognized the rest of the group because they were from Sixteenth Avenue. Branch got out of the car, but Gibson stayed inside. They left approximately fifteen minutes later.

Gibson drove down South Orange Avenue, turned onto Ninth Street, and double-parked in the street, keeping the car running. She got out of the car and walked toward a gate to speak with her friend. Gibson's son went around to the driver's side to get in the car but saw a man pointing a gun at him, who told him to "back the f[***] up." When Gibson saw her son moving away from the car, she went to ask what was wrong and realized someone was standing at the car.

Gibson's son recalled the man with the gun was wearing a gray hoodie and was "light[-]skinned," but he could not describe the man further. He heard the

A-2029-22

man ask "[w]here the racks at."  The son understood "racks" to mean "a lot of money."  Gibson also saw this man and remembered he had a small gun and was wearing a gray sweatsuit.

Gibson saw another man by the passenger side door who appeared to be "[f]ighting.  Like, trying to get money out of [Branch's] hand or pocket."  Her son also saw this man, but he did not get a good look at him.  He told detectives he would be unable to recognize the man if he saw a photograph of him.  The son did not see if the man at the passenger side was armed, but he saw him pointing and assumed he was armed.

Branch "looked stuck," so Gibson went to the other side, "banging on the car to get the guy's attention.  Like, what's going on, why are you doing this[?]"  However, Gibson's son grabbed her, concerned the man on the driver's side would shoot her.

Gibson heard two gunshots.  She saw the men get into a car, which backed out onto South Orange Avenue.  Her son also heard two shots and saw the men run back to a black Jeep, which drove off.

Both Gibson and her son saw Branch lying on the ground.  The son said Branch's "pockets [were] empty but . . . he always keep[s] money on him.  I know him.  We['re] close.  His pockets were inside-out."

Detective Christopher Burrell arrived at the scene between 12:10 and 12:30 a.m. He described the area as commercial/residential with an apartment complex and a barbershop around the corner. The detective saw a black two-door Honda Accord with both doors open and noticed a shell casing at the front of the driver's side door and two behind the rear tire of the passenger's side. Investigator Antonio Badim later examined the casings and concluded they were discharged from the same firearm.

Detective Burrell also noticed a video surveillance camera on the corner of South Orange Avenue and South Ninth Street at the barbershop. He obtained footage from the barbershop camera, which showed that at 11:02 p.m., a black two-door vehicle pulled over in the right lane. A black SUV, later identified as a Jeep Grand Cherokee SRT, also pulled over in the right lane. One of the Jeep's rear tires appeared to be a spare. At approximately 11:04 p.m., an individual in a gray sweatshirt, gray sweatpants, and white sneakers exited the SUV from the driver's side rear door. Moments later, the SUV's driver exited the vehicle. Then, an individual exited the SUV from the front passenger door and walked around to the driver's seat. At 11:06 p.m., the SUV reversed onto South Orange Avenue and "fled" to the right.

7

Investigators extracted data from Wormley's cellphone and towed his Jeep to the crime scene garage. Detective Grace Marotta processed the Jeep and collected nine items from the vehicle, which did not yield any prints. Gibson's Honda was also towed and processed. Although Detective Marotta recovered two potential latent palm prints, there were no matches found. She also recovered two bags from the Honda, but they were not tested for prints.

Defendant was charged in connection with the shooting and arrested. Detective Burrell obtained search warrants for two cell phone carriers to obtain defendant's cell phone records. Defendant's cell phones were also seized for data extraction and analyzed by Special Agent John Hauger of the Federal Bureau of Investigations.

Detective Burrell applied for a warrant to search defendant's residence. The search yielded blue jeans, but no gun, cash, money, or jewelry.

Branch's autopsy revealed he had five wounds from three gunshots. A projectile was recovered from Branch's right-side abdomen. The cause of death was multiple gunshot wounds and ruled a homicide.

After defendant was charged, the State sought a protective order for Wormley, Gibson, and her son. On February 20, 2020, the court granted the State's application based on defendant's suspected gang membership and the fact

A-2029-22

that Wormley had "indicated any number of times his fear and concern in this particular case." The protective order permitted the State to withhold the witnesses' personal information from defendant and defense counsel, but instructed the State to make them available for interviews.

On October 11, 2022, Wormley was picked up by the prosecutor's office under a material witness warrant and lodged in a hotel until trial. At trial, his testimony was largely consistent with his statement to police. He added that on April 27, 2019, he drove his Jeep to defendant's home and the pair drove around, stopping at a gas station to replace a flat tire with a spare. Wormley wanted to go to his mother's house to "pass out" because he was "high and drunk," but defendant convinced him to stay. After they left the gas station, with defendant driving and Wormley in the front passenger seat, they went to South Orange Avenue and Twentieth Street, where defendant got out and spoke to a group of people. One individual from this group, wearing a gray sweatsuit with a hood on, got into the Jeep behind Wormley. When defendant returned to the vehicle, he told Wormley: "This is my Little Bro. He's good."

Wormley testified defendant drove off to get pain pills and parked on Ninth Street and South Orange Avenue near a barbershop. Little Bro exited the Jeep and approached the driver's side of a Honda that was "in the street waiting

for [them]" and Wormley saw him pull out a gun. Then, there "was a bunch of commotion, . . . a bunch of screaming back and forth. The guy had the gun up to [Branch] and then after a couple of seconds, . . . [defendant] exited the driver's side . . . and runs up to the vehicle . . . to the victim's car."

Defendant approached the passenger side, opened the door, and "was . . . yelling at the guy or probably rummaging through his stuff in the car." Wormley did not see defendant with a gun, but "he definitely took part in a robbery" because he ran to the passenger side of the door. A girl was screaming, and Wormley exited the Jeep's passenger door and went around to the driver's side "to get the hell out of there" when he heard "about four or five shots."

Before Wormley could drive away, Little Bro and defendant reentered the Jeep. Wormley demanded they exit the car, but they refused and told him to "pull off." He complied because he just saw them kill someone. Wormley dropped defendant and Little Bro off at Eleventh Avenue and Littleton Avenue.

Wormley returned home, called his family and friends, and then called defendant "probably [sixty] times." Defendant never picked up his phone. He called defendant again the following day, and defendant told him "to relax, everything was going to be all right, that I got him nervous because I called him, like [fifty] something times, [sixty] something times, mak[ing] him think that I

10

was . . . going to give it up on him." Wormley explained he did not immediately go to the police because he "was afraid . . . they were going to look at [him] as a suspect and . . . [defendant] might . . . have something or do something to [him]."

The State subpoenaed Gibson to testify. She was brought into the courtroom, outside of the presence of the jury, in handcuffs and escorted by three officers. When the clerk attempted to administer the oath, she refused to reply. The trial judge advised her that if she refused to answer questions, she could be found in contempt and face consequences "ranging from fines to six months in jail." Gibson refused to be sworn in. Her attorney advised the judge Gibson understood the consequences of not testifying and was choosing not to do so. The judge found her in contempt and fined her $100 per day until she testified. He ordered her to appear the following day, otherwise a bench warrant would be issued for her arrest. She did not appear, and the judge reserved "on any further action as to her."

Due to Gibson's failure to testify, defendant requested a jury instruction on third-party guilt, arguing she had information concerning two possible suspects, Yab and D-Money. The defense suggested that because Wormley met D-Money prior to the homicide, D-Money might have been implicated.

The State requested the judge instruct the jury regarding Gibson's unavailability. The judge told the jury Gibson was unavailable and instructed they were "not to speculate as to the reasons why she's unavailable."

After Detective Burrell testified the first day of trial, Juror 13 did not return. When the juror was contacted, he advised the judge he recognized the detective when he took the stand, although he had not recognized him by name earlier. Juror 13 stated he worked on Burrell's car. He did not inform the judge immediately because he figured he would "do it at the end" of the day, but he did not get the chance because the jury was released early. He tried not to make eye contact with the detective while he was on the stand and did not tell the other jurors he knew the detective. The judge excused Juror 13, instructed the other jurors they were not to speculate about why the juror was excused, and explained the excusal should not affect their deliberations.

During summation, the prosecutor replayed surveillance footage that had been played for the jury during the trial showing the Jeep at South Twentieth Street and South Orange. However, for the first time, the prosecutor zoomed in on the video. The prosecutor also played the surveillance footage from the barbershop on South Ninth Street and South Orange Avenue, showing the Honda Accord and Jeep, and again zoomed in on the video.

Following summations but prior to the jury instructions, Juror 3 told the jury management coordinator she had seen someone she knew in the courtroom and felt uncomfortable. She informed the judge she had identified "certain people" in the courtroom that she had "seen before," and felt "nervous," even though she was unsure if those people recognized her. The juror did not reveal this information to anyone else, and she was also excused from the jury. The judge gave the jury the same instruction he had given regarding Juror 13, about not speculating regarding Juror 3's excusal or letting it affect their deliberations.

Before the jury rendered its verdict, defendant expressed concerns about "the jurors' level of paying attention" throughout the trial, and said he believed Juror 13 or 14 "had some sort of conversation in court with one of the family members of the decedent." The judge noted defendant's observation for the record.

The jury convicted defendant of the conspiracy, robbery, and felony murder offenses. It acquitted him of murder, possession of a handgun without a permit, and possession of a handgun for an unlawful purpose.

At sentencing, defendant's brother and sister spoke on his behalf. The judge merged the conspiracy and robbery convictions with felony murder and

sentenced defendant to forty-five years' incarceration, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant raises the following points on appeal:

POINT I

BECAUSE THE COURT DID NOT ADEQUATELY ANSWER THE JURY'S QUESTION OR INSTRUCT THE JURY, REVERSAL IS REQUIRED. (Not raised below).

A. The Court Failed to Adequately Answer the Jury's Question.

B. The Court Gave the Wrong Accomplice Liability Instruction.

C. The Court's Instructions on Co[-]conspirator Liability Were Confusing and the Prosecutor's Summation Repeatedly Misstated the Law.

D. The Court Plainly Erred in Not Instructing on the Law of Attempt.

POINT II

THE PROTECTIVE ORDER VIOLATED [DEFENDANT'S] CONSTITUTIONAL RIGHTS, REQUIRING REVERSAL.

POINT III

THE COURT FAILED TO INVESTIGATE JUROR MISCONDUCT, REQUIRING REVERSAL OR REMAND. (Not raised below).

14                                                                    A-2029-22

POINT IV

REVERSAL IS REQUIRED DUE TO THE IMPROPER ADMISSION OF HIGHLY PREJUDICIAL EVIDENCE.  (Not raised below).

A.   The Admission of Improper Lay Opinion Regarding the Video Surveillance and Wormley's Credibility Constituted Plain Error.

B.  The Admission of Wormley's Lay Opinion on An Ultimate Issue Also Constituted Plain Error.

C.   The Admission of Arrest Photos Requires Reversal as the Photos Were Minimally Probative and Highly Prejudicial.

POINT V

RESENTENCING IS REQUIRED AS THE COURT FAILED TO PROPERLY CONSIDER THE AGGRAVATING AND MITIGATING FACTORS.

A.  The Court Failed to Consider [Defendant's] Age.

B.  The Court Improperly Relied on Dismissed and Diverted Charges.

C.   The Court Should Have Considered Mitigating Factor [Eleven].

I.

Defendant argues several errors related to the jury instructions, none of which were raised before the trial judge.  As a result, we review these arguments

A-2029-22

under the plain error standard. R. 2:10-2. This "requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). "The error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

A.

During deliberations, the jury asked if finding defendant guilty of conspiracy would also require it to find he was an accomplice to, and guilty of, the actions of the co-conspirator. Defendant argues the answer should have simply been "no." At a minimum, because the jury seemed confused by the difference between a co-conspirator and an accomplice, the judge should have explained the different elements, rather than re-read portions of the original confusing instructions. He claims the jury's conflation of co-conspirator and accomplice led it to convict him of robbery and felony murder.

If a jury seeks clarification during deliberation, a trial court "is obligated to clear the confusion." State v. Savage, 172 N.J. 374, 394 (2002) (quoting State

16

v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984)). When a jury asks a question seeking clarification, trial judges are encouraged, "when the law is clear, to respond directly to unambiguous and specific 'yes' or 'no' questions from juries during deliberations, rather than simply re-read the final jury charge." State v. Berry, 254 N.J. 129, 146 (2023).

The jury asked the following question:

> If we find there was a conspiracy to commit robbery (guilty on Count 1), must we find that [defendant] is an accomplice and culpable for anything related to 2, 3, 5 and 6, that we believe the un-indicted co-conspirator[1] is guilty of doing? Example, if Little Bro was guilty of robbery, then [defendant] is guilty of robbery as an accomplice.

The trial judge and counsel discussed how to answer the question, and without objection, the judge answered the jury's question by reinstructing it that to find defendant guilty as an accomplice, it "must find that the defendant had the purpose to participate in that particular crime. He must act with the purpose of promoting or facilitating the commission of the substantive crime with which he is charged." The court concluded these instructions by telling the jury that

> if you find beyond a reasonable doubt that this un-indicted co-conspirator committed the crimes of robbery, unlawful possession of a weapon and possession of a weapon for unlawful purpose, and also

---

[1] Investigators were unable to locate Little Bro.

that . . . defendant conspired with his un-indicted co-conspirator to commit those crimes, then you must find . . . defendant guilty of the crimes of robbery, murder, unlawful possession of a weapon and possession of a weapon for unlawful purpose.

We are unconvinced that re-reading the instruction to the jury was reversible error. The jury found defendant guilty of the conspiracy to commit a robbery and of the robbery itself, but did not convict him of either weapons charge. If the jury had conflated accomplice and co-conspirator liability, it would have found defendant guilty of at least possession of a weapon for an unlawful purpose. Having asked whether such a finding was necessary, it is clear the jury understood from the judge's reinstruction that the answer was no.

B.

Defendant argues the trial judge gave an incorrect accomplice liability instruction to the jury by failing to inform it that an accomplice could be liable for a lesser offense and that for defendant to be guilty of first-degree robbery, the jury had to find he shared Little Bro's intent to commit first-degree robbery. He asserts the jury may not have found that he knew Little Bro was armed or had the intent to commit an armed robbery, considering defendant was charged with conspiracy to commit robbery, not armed robbery. Therefore, the robbery and felony murder convictions should be reversed.

18

Where a court gives an instruction in accordance with the appropriate model jury charge, it is difficult to find plain error. State v. Ramirez, 246 N.J. 61, 70 (2021) (citing Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000)). Verdict sheets are considered part of a trial court's instruction to the jury and are therefore reviewed under the same standard. Galicia, 210 N.J. at 388. If the verdict sheet contains error but the trial court's instructions clarify the legal standard for the jury, the verdict sheet's error may be deemed harmless. Id. at 387.

A person may be found liable for the conduct of another as an accomplice if he "acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." State v. Bielkiewicz, 267 N.J. Super. 520, 527-28 (App. Div. 1993) (quoting State v. White, 98 N.J. 122, 129 (1984)). An accomplice must solicit the other person to commit an offense, aid, agree, or attempt to aid the other person in the planning or commission of the offense, or have the legal duty to prevent the commission of the offense and fail to make a proper effort to do so. N.J.S.A. 2C:2-6(c)(1). An accomplice may be convicted "on proof of the commission of the offense and of [their] complicity therein." N.J.S.A. 2C:2-6(f).

An accomplice can only be liable for the actions of another if they "shared in the intent[,] which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." Bielkiewicz, 267 N.J. Super. at 528 (quoting State v. Fair, 45 N.J. 77, 95 (1965)).  If there is a shared intent, an accomplice can be found guilty of armed robbery, even if they do not possess or use a firearm or other weapon; it is enough that they "committed the same crime as the individual who possessed or used the gun if the accomplice had the purpose to promote or facilitate that crime, namely, robbery with the use of a firearm.  One is the alter ego of the other."  White, 98 N.J. at 130 (internal citations omitted).

If two people commit a robbery, but only one person "strikes the fatal blow," both parties are equally guilty of felony murder.  State v. Smith, 32 N.J. 501, 521 (1960).  However, if the intent of each differs, "[e]ach defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent[,] and state of mind." Fair, 45 N.J. at 95.  For instance, "if two should attack and one of them intends only a simple assault and battery and is unaware of the intent of the other to use deadly force, [they] would be culpable only according to [their] own [respective]

intent and wrong." Bielkiewicz, 267 N.J. Super. at 528 (quoting State v. Madden, 61 N.J. 377, 391 (1972)).

"It is not fatal to the State's case that . . . other . . . circumstances[] permit some other rational explanation of defendant's conduct or fail to exclude every other conceivable hypothesis except guilt." State v. Brown, 80 N.J. 587, 599 (1979). Rather, it is up to the factfinder to "first determine what the putative accomplice intended to do." Ramirez, 246 N.J. at 68. The accomplice liability model jury charge states: "It is not sufficient to prove only that the defendant had knowledge that another person was going to commit the crime(s) charged. The State must prove that it was defendant's conscious object that the specific conduct charged be committed." Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6(c)(1)(c))," at 1 & n.3 (approved June 2021) (citing Ramirez, 246 N.J. at 69).

Here, the jury was instructed on the distinction between first- and second-degree robbery as follows:

> If you find the State has proven beyond a reasonable doubt that . . . defendant committed the crime of robbery as I have defined that crime to you, but if you find that the State has failed to prove beyond a reasonable doubt as to whether . . . defendant purposely attempted to kill . . . Branch or . . . defendant purposefully inflicted or attempted to inflict serious bodily injury upon . . . Branch at the time of the

> commission of the robbery, then you must find . . . defendant guilty of robbery in the second degree. If you find the State has proven beyond a reasonable doubt that . . . defendant, while in the course of committing a theft, purposely attempted to kill or purposely inflicted or attempted to inflict serious bodily injury upon . . . Branch, then you must find . . . defendant guilty of robbery in the first degree.

Following this charge, the judge defined accomplice for the jury as a person who "with the purpose of promoting or facilitating the commission of the offense . . . solicits such other person to commit it and/or aids or agrees or attempts to aid such other person in planning or committing it." The jury was instructed to consider defendant's status as an accomplice for each charge separately. They were further instructed that "[p]articipation and agreement can be established from conduct as well as the spoken word."

Wormley testified Little Bro pulled out a gun and then defendant, "after a couple of seconds," also exited the Jeep, approached the Honda, and appeared to aid in the robbery. Based on these facts, defendant did not have to carry a firearm to be found guilty of first-degree robbery; it was enough that Little Bro was armed with and used a gun during the robbery. Likewise, defendant was not required to strike the fatal blow to be found guilty of felony murder; it was enough that Little Bro killed Branch during a robbery in which defendant was an accomplice. The jury could reasonably infer defendant shared Little Bro's

22

intent because he saw the gun and still chose to exit the Jeep and aid Little Bro in the armed robbery. The jury instructions were not erroneous and did not prejudice the outcome.

C.

Defendant asserts the jury instructions regarding co-conspirator liability were inaccurate because they failed to distinguish between the first- and second-degree conspiracy causing the jury to believe it had to find defendant guilty of first-degree robbery if Little Bro was guilty of the offense, even if first-degree robbery was not a part of the conspiracy. This problem was compounded by the prosecutor's opening statement, which wrongly argued a conspirator is responsible for all the acts of a co-conspirator.

A person is guilty of conspiracy if they act with the purpose of promoting or facilitating the commission of that crime and:

> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
> [N.J.S.A. 2C:5-2(a).]

The model jury charge for conspiracy states a person "is legally accountable for the conduct of another person when [they are] engaged in a conspiracy with such other person and the conduct is within the scope of the conspiracy." Model Jury Charges (Criminal), "Conspiracy—Vicarious Liability (N.J.S.A. 2C:2-6(b)(4))," at 1 (approved Oct. 17, 1988) (citation reformatted).

A person may be held legally accountable for the actions of another when they are "engaged in a conspiracy with such other person." N.J.S.A. 2C:2-6(b)(4). Criminalizing conspiracies punishes "jointly planned criminal activity quite apart from any underlying offense involved in the conspiracy." State v. Kamienski, 254 N.J. Super. 75, 93 (App. Div. 1992) (citing State v. Hardison, 99 N.J. 379, 383 (1985)). The "agreement need not be formal or express." Id. at 94 (citing United States v. Zang, 703 F.2d 1186, 1191 (10th Cir. 1982)). "An implicit or tacit agreement may be inferred from the facts and circumstances." Ibid. Although evidence might be circumstantial and there is "[n]o doubt the jurors could have reached a different conclusion," the evidence need "not exclude every conceivable hypothesis except guilt" and a jury can still find a conspiracy exists. State v. Samuels, 189 N.J. 236, 249 (2007).

So long as a conspiracy exists, the acts of one conspirator outside of the agreement may be the act of all conspirators, "provided the substantive act could

'be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" State v. Bridges, 133 N.J. 447, 455-56 (1993) (quoting State v. Stein, 70 N.J. 369, 388 (1976)). It is reasonable or foreseeable that a robber, expecting resistance from a victim, "had an alternate plan for persuasion." Samuels, 189 N.J. at 248.

Conspiracy and accomplice liability are not interchangeable, because conspiracy requires proof that an agreement was entered into, while accomplice liability does not. Id. at 254. While a defendant may only be held liable for the actions committed by an accomplice if he shares the same intent or purpose, N.J.S.A. 2C:2-6(c), "the acts of one conspirator in furtherance of the conspiracy are deemed to be the acts of all of the co-conspirators under a mutual-agency theory." Bridges, 133 N.J. at 454-55 (citing Stein, 70 N.J. at 339-40). The jury decides "the purpose with which the defendant acted." Model Jury Charges (Criminal), 3 "Conspiracy" (N.J.S.A. 2C:5-2) (rev., Apr. 12, 2010) (citation reformatted).

The judge instructed the jury that conspiracy to commit robbery is "separate and distinct from the crime of robbery," and to find defendant guilty of conspiracy, the State had to prove

> One, that the defendant agreed with another person or
> persons that they or one or more of them would engage

25                                                           A-2029-22

in conduct which constitutes a crime or an attempt or solicitation to commit such crime. Two, that the defendant's purpose was to promote or facilitate the commission of the crime of robbery.

The verdict sheet also distinguished between first- and second-degree robbery. It asked if defendant "in the course of committing a theft upon . . . Branch, did inflict bodily injury or use force against . . . Branch or did threaten . . . Branch with, or purposely put him in fear of immediate bodily injury." If the jury answered in the affirmative, it was then asked to decide if during the robbery "defendant use[d], threaten[ed] the immediate use of, or was . . . armed with a deadly weapon?"

The jury was instructed defendant could only be found legally accountable for the actions of a co-conspirator if the co-conspirator's "conduct is within the scope of the conspiracy." If they found Little Bro committed robbery, murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose, and defendant conspired with Little Bro to commit those crimes, then defendant must be found guilty of those crimes as well.

The jury was instructed it could infer from defendant's conversation with Little Bro at South Orange Avenue and Twentieth Street, vouching for Little Bro when he entered the Jeep, and driving to South Orange Avenue and Ninth Street under the pretense of obtaining pain pills, that the two had conspired to

26

commit a robbery. It could also find it foreseeable that during a robbery, a robber may use a deadly weapon in his possession.

We discern no reversible error. The judge's instructions regarding first- and second-degree robbery were clear and in accordance with the model charges.

During summations, the prosecutor argued defendant is "liable for the conduct of his co-conspirator based on the law the judge will read to you." Although the prosecutor's argument lacked the nuance that the actions must be within the scope of the conspiracy, the judge's subsequent instructions were clear that the co-conspirator's conduct must be within that scope. Moreover, the judge instructed the jury that the arguments of the attorneys did not constitute evidence. The jury is presumed to follow the court's instructions. State v. Burns, 192 N.J. 312, 335 (2007). We have no reason to believe they did not do so in this instance.

D.

Defendant argues the trial judge should have instructed the jury on attempt because there was no evidence the theft was completed. The jury should have been instructed the State needed to prove there was a substantial step taken toward effectuating the theft to find a theft occurred.

27

Theft is the unlawful taking, or exercise of unlawful control over, the property of another with the purpose to deprive the lawful owner thereof. N.J.S.A. 2C:20-3. A person may be guilty of attempted theft when they act "with the kind of culpability otherwise required for the commission of the crime" and "purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1. A "substantial step" is taken when a person "acts in a way that is 'strongly corroborative of the firmness of his purpose' to carry out the crime." State v. Farrad, 164 N.J. 247, 258 (2000) (quoting State v. Fornino, 223 N.J. Super. 531, 538 (App. Div. 1988)).

Robbery is an aggravated form of theft, and so "all robberies are thefts, but not all thefts are robberies." State v. Mejia, 141 N.J. 475, 495 (1995), overruled on other grounds, State v. Cooper, 151 N.J. 326, 378 (1997). A defendant is guilty of robbery if, "in the course of committing a theft, [they]: (1) [i]nflict[] bodily injury or use[] force upon another; or (2) [t]hreaten[] another with or purposely put [them] in fear of immediate bodily injury; or (3) [c]ommit[] or threaten[] immediately to commit any crime of the first or second degree." N.J.S.A. 2C:15-1.

Robbery can occur even "in an attempt to commit theft or in immediate flight after the attempt or commission." N.J.S.A. 2C:15-1(a). A defendant can be convicted, "even if the theft is unsuccessful, if [they] (1) purposely take[] a substantial step (2) to exercise unlawful control over the property of another (3) while threatening another with, or purposely placing another in fear of, immediate bodily injury." Farrad, 164 N.J. at 258 (citing State v. Sein, 124 N.J. 209, 215 (1991)). If during "the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery," a defendant "causes the death of a person other than one of the participants," then the defendant is also guilty of felony murder. N.J.S.A. 2C:11-3(a)(3).

The model jury charges for first- and second-degree robbery instruct the court to define attempt if an attempt is involved. Model Jury Charges (Criminal), 2 n. 6, "Robbery in the First Degree (N.J.S.A. 2C:15-1)," (rev., Sep. 10, 2012); Model Jury Charges (Criminal), "Robbery in the Second Degree (N.J.S.A. 2C:15-1)," at 4 n.6 (rev., July 2, 2009). Where there is a question of whether a crime was completed, the jury should be instructed to consider whether the State proved the defendant attempted to commit the crime. Model Jury Charges (Criminal), "Attempt (N.J.S.A. 2C:5-1)," at 1 (rev., June 15, 2009) (citation reformatted) (citing N.J.S.A. 2C:1-8d). The State must prove the

defendant took a "substantial step in the course of conduct planned to culminate in [their] commission of the crime," and the step "must strongly show the defendant's criminal purpose." Id. at 3.

In State v. Gonzalez, we vacated a defendant's convictions of first-degree robbery and felony murder because there was no evidence the victim was robbed, and therefore the State was "obliged to prove . . . [the] defendant had attempted to commit robbery and in the course thereof[,] the victim was shot and died." 318 N.J. Super. 527, 532-33 (App. Div. 1999), abrogated on other grounds, State v. Hill, 199 N.J. 545, 565-66 (2009). The jury in Gonzalez was "never apprised that attempt requires purposeful conduct as compared to purposeful or knowing conduct," or instructed that a "substantial step" was necessary to constitute an attempt. Gonzalez, 318 N.J. Super. at 534. We held "[s]ince theft or attempted theft from the person is not a predicate crime for felony murder, the failure to charge the concept of attempt in the predicate offense of robbery, and its specific component, 'substantial step,' N.J.S.A. 2C:5-1(b), constitutes plain error." Id. at 536 (citation reformatted); see also State v. Dehart, 430 N.J. Super. 108, 119 (App. Div. 2013) (finding where there is no evidence that defendant took anything from a victim, a trial court is required to instruct the jury on the law of attempt as an element of robbery).

Where a court instructs a jury on attempt in relation to a different charged offense, it is not error to omit the definition in the context of robbery. State v. Smith, 322 N.J. Super. 385, 399 (App. Div. 1999). In State v. Belliard, 415 N.J. Super. 51, 74 (App. Div. 2010), we held it was not plain error to omit the "substantial step" requirement of attempt because the defendant's conduct in an alleged robbery went "unmistakably beyond the stage of mere preparation and was a substantial step in the commission of the offense, as planned by the other individual."

The State concedes there was no evidence of any property taken from Branch. The trial judge did not define attempt regarding the robbery. He addressed attempt in relation to the attempt to kill or inflict serious bodily harm, and instructed that a person must "purposely commit[] an act which constitutes a substantial step towards the commission of a killing or the infliction of serious bodily harm." However, like Belliard, the judge addressed the purposeful acts and culpability elements of attempt in the accomplice liability charge because defendant's exiting the Jeep, opening the Honda door, and rummaging through the vehicle, would qualify as a substantial step towards the attempted robbery. We conclude there was no reversible error because the elements of attempt were explained to the jury.

## II.

Defendant argues the protective order allowing the State to withhold the addresses of eyewitnesses infringed upon his constitutional rights to: present a defense; confront his accuser; and receive effective assistance of counsel. The withholding of the eyewitnesses' addresses prevented the defense from challenging witness credibility, investigating the witnesses' reputations in their neighborhood, and conducting pretrial interviews. The circumstances did not require "heightened protections" for the three eyewitnesses and did not outweigh defendant's right to confront, investigate, and question the witnesses.

We review this issue for an abuse of discretion. State v. Ramirez, 252 N.J. 277, 298 (2022). "A trial court can abuse its discretion 'by failing to consider all relevant factors.' [We] . . . will set aside . . . such decisions if they do not comport with the applicable law or do not give sufficient regard to pertinent considerations." Ibid. (quoting State v. S.N., 231 N.J. 497, 500 (2018)) (internal citations omitted).

A defendant is entitled to discovery from the State, including the "names, addresses, and birthdates of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the prosecutor as to which of those persons may be called as witnesses." R. 3:13-3(b)(1)(F).

However, the State may move for a protective order "to redact, delay, or withhold the disclosure of materials that would expose witnesses and others to harm . . . or compromise some other legitimate interest."  State in the Int. of N.H., 226 N.J. 242, 256 (2016).  Upon good cause shown, the court can deny, restrict, defer, "or make such other order as is appropriate" in deciding a request for a protective order.  R. 3:13-3(e)(1).  "In determining the motion, the court may consider . . . protection of witnesses and others from physical harm . . . or any other relevant considerations."  Ibid.  Good cause is assessed under "the totality of the circumstances."  Ramirez, 252 N.J. at 297 (citing State v. Buhl, 269 N.J. Super. 344, 356 (App. Div. 1994)).

Our Legislature has stated "without the participation and cooperation of crime victims and witnesses, the criminal justice system would cease to function.  The rights of these individuals should be given full recognition and protection."  N.J.S.A. 52:4B-35.  Witnesses have the right to "be free from intimidation, harassment[,] or abuse by any person including the defendant or any other person acting in support of or on behalf of the defendant, due to the involvement of the victim or witness in the criminal justice process."  N.J.S.A. 52:4B-36(c).  The Supreme Court has also recognized "the chilling and inhibiting effect that discovery can have on material witnesses who are subject

to intimidation, harassment, or embarrassment."  Ramirez, 252 N.J. at 296 (quoting State v. D.R.H., 127 N.J. 249, 256 (1992)).

Weighed against the rights of victims and witnesses are the rights of a defendant, which are "protected expressly or impliedly by the federal and New Jersey Constitution, and decades of jurisprudence."  Id. at 303.  Defendants have the right to be confronted with the witnesses against them.  U.S. Const., amend. VI; N.J. Const., art. I, ¶ 10.  Their right to effective assistance of counsel, includes that counsel can conduct a reasonable investigation by interviewing witnesses.  Ramirez, 252 N.J. at 303-04 (first citing State in the Int. of A.B., 219 N.J. 542, 547 (2014); and then citing ABA Crim. Just. Standards for the Def. Function standard 4-4.3 (4th ed. 2017)).

The name and address of a witness are essential "because they 'open countless avenues of in-court examination and out-of-court investigation.'"  State v. Florez, 134 N.J. 570, 581 (1994) (quoting Smith v. Illinois, 390 U.S. 129, 131 (1968)).  This is especially true where credibility of the witness is pivotal to an issue.  Ibid.  That a witness was "subject to cross-examination does not resolve the due process issue.  The right to present a complete defense encompasses access to adverse witnesses during the investigation phase of the defense."  State v. Blazas, 432 N.J. Super. 326, 340-41 (App. Div. 2013).

However, "a defendant's right to . . . pretrial investigation is not absolute." Ramirez, 252 N.J. at 304. Courts may limit disclosure of a witness's address if it "tend[s] to endanger the personal safety of the witness." Id. at 306 (alteration in original) (quoting Smith, 390 U.S. at 133-34). Even without court-imposed limits, a witness may still decline to be interviewed; "the protected . . . right is the opportunity for pretrial access[, but] it is not a guarantee of pretrial access." Blazas, 432 N.J. Super. at 343.

One factor the court may consider when determining if a protective order is necessary is whether a defendant possesses material that can be used to impeach the witness on cross-examination. State v. Postorino, 253 N.J. Super. 98, 107 (App. Div. 1991). A court may also consider "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Florez, 134 N.J. at 579 (quoting Roviaro v. United States, 353 U.S. 53, 62 (1957)). Also relevant is the nature of the alleged threats to the witness's safety and whether those threats were limited in time. Postorino, 253 N.J. Super. at 107.

A court may place in the protective order certain "safeguards" to protect the rights of victims or witnesses while also protecting the rights of a defendant. See id. at 108 (remanding so the trial court could conduct an in-camera

proceeding to ascertain what testimony a witness might offer to determine whether defendant would need his current name and address to conduct an effective cross-examination).

The trial judge found that Wormley believed defendant "may be a Bloods gang member" and expressed "his fear and concern" numerous times in his statement to the police. The judge balanced defense counsel's need to interview as many witnesses as possible, including Wormley, Gibson, and her son against the State's "legitimate concern for the safety of their sole eyewitness and these other two witnesses." He tried to "strike a very fair balance to permit the defense to have an opportunity to interview" the witnesses and found it was appropriate to withhold the addresses of the witnesses, provided that the State make them available to the defense for interviews. The judge concluded: "I don't see how that, in any way, inhibits and deprives . . . defendant or his attorney or their investigators of the opportunity to question these witnesses. If anything, it may even enhance the ability for them to be interviewed."

We discern no abuse of discretion or misapplication of law. Wormley told police he did not immediately report the shooting because he "was scared of the fact that [defendant] knows my car. He knows where my girlfriend live[s]. He . . . can kill me." When Wormley tried to reach defendant after the shooting and

36

defendant eventually returned his calls, defendant expressed concern that Wormley was going to "give it up." Although defendant did not expressly threaten Wormley if he spoke with police, defendant's comments reflect he knew Wormley was an eyewitness. Wormley testified he did not immediately go to the police because he was afraid defendant might do something to him. Considering that investigators never found Little Bro, Wormley's perceptions and his fear of defendant were reasonable.

For confrontation purposes, the defense had Wormley's statement and the surveillance footage. There was no mystery as to where the offense occurred. Defendant knew Wormley to a degree that they rode around together in Wormley's vehicle, which defendant operated the night of the incident. We are unpersuaded that providing Wormley's address was somehow critical to defendant's confrontation rights or attacking Wormley's credibility, especially where the defense had the ability to interview him. Nor does the record establish how Gibson or her son's addresses were relevant considering they did not testify. Given the facts they had knowledge as eyewitnesses, there is no indication why the defense would want them to testify.

37

III.

Defendant argues his convictions should be reversed because the trial judge failed to investigate juror misconduct. He asserts the judge should have questioned the entire jury to determine if they were tainted by either Juror 3 or 13. Defendant claims the judge compounded these errors when he gave short shrift to defendant's concern about juror attentiveness.

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to an impartial jury during trial. State v. R.D., 169 N.J. 551, 557 (2001). Criminal defendants are "entitled to a jury that is free of outside influences and [that] will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." State v. Williams, 93 N.J. 39, 60 (1983). "The securing and preservation of an impartial jury goes to the very essence of a fair trial." Ibid.

"[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)). "[T]he court must . . . determine whether the jurors are capable of

fulfilling their duty in an impartial and unbiased manner." State v. McGuire, 419 N.J. Super. 88, 153 (App. Div. 2011) (citing R.D., 169 N.J. at 557-58).

"[T]he trial court is in the best position to determine whether the jury has been tainted." R.D., 169 N.J. at 559. It must "consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid. If there is a possibility of juror taint, the judge must voir dire the potentially tainted juror and, "in appropriate circumstances, the remaining jurors." State v. Bisaccia, 319 N.J. Super. 1, 13 (App. Div. 1999) (citing State v. Scherzer, 301 N.J. 363, 486 (App. Div. 1997)).

When a party alleges a juror is inattentive, a trial judge "should explain adequately on the record the judge's personal observations, if any, regarding the juror's attentiveness." State v. Mohammad, 226 N.J. 71, 89 (2016). If a judge did not personally observe the juror's inattentiveness, the judge should conduct an individual voir dire. Ibid. If the juror is found to have been inattentive during an inconsequential part of the trial, the court has broad discretion over any corrective action; if the court finds the juror was inattentive during a consequential part of the trial, the trial court "must take appropriate corrective

action." Id. at 89-90. When there are alternate jurors, "the trial judge, for good cause shown, may excuse a juror where the circumstances warrant." State v. Reevey, 159 N.J. Super. 130, 134 (App. Div. 1978).

We apply an abuse of discretion standard to the trial court's determinations regarding claims of juror taint. R.D., 169 N.J. at 559-60. A trial judge's control of their courtroom and any remedial action taken regarding an inattentive juror is reviewed under the same standard. Mohammad, 226 N.J. at 89. However, a reviewing court should not ask whether an irregular jury matter "actually influenced the result, but whether it had the capacity of doing so." State v. Grant, 254 N.J. Super. 571, 583 (App. Div. 1992) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)). The irregularity is presumed to have had the capacity to influence the outcome "unless it has affirmatively been shown it does not." Id. at 588 (citing State v. Sachs, 69 N.J. Super. 566, 588 (App. Div. 1961)).

In R.D., a juror advised the trial court he recognized the victim's mother when she took the stand, even though he had not recognized her name. 169 N.J. at 562. The Court held no additional questioning of the other jurors was necessary because "not only had the excused juror denied communicating his knowledge to other jurors, but there also was no chance for the excused juror to communicate his extraneous information about the witness to the other jurors."

Ibid.  The trial judge had "sufficient opportunity to observe the juror during his two exchanges with him and form an opinion concerning the juror's credibility and reliability, particularly in light of the corroborating circumstances."  Ibid.

When the trial judge learned about Juror 13's familiarity with Detective Burrell, he removed him from the panel and questioned the juror during a break "regarding what effect, if any, this knowledge has had on the jury."  Pursuant to the judge's interrogation, he was satisfied with Juror 13's representation that he did not speak to Detective Burrell or with any of the other jurors.  There is no evidence in the record contradicting the judge's findings and we discern no abuse of discretion because he did not voir dire the remaining jurors.

The following day, when Juror 3 advised court staff she recognized some of the people in the courtroom, the judge questioned the juror and was satisfied she had not discussed the matter with any other jurors and excused her with no objection from either party.  Unlike Juror 13, Juror 3 could not identify who she knew, where she knew them from, or even how they were related to the matter, if at all; she just recognized some of the people "out here period."  Her ability to taint the jury was more remote than Juror 13.  The judge's conclusion that Juror 3 did not taint the panel was not an abuse of discretion.

Defendant waited until the last day of trial to tell the judge that a juror had a conversation with one of the victim's family members and some of the jurors were not paying attention. The judge noted defendant's concern and observed this had not been brought to his attention during the trial. In relaying defendant's concerns, defense counsel noted that "after [defendant] raised that issue, I looked. I didn't see any interaction." The judge found it was unlikely any juror would have had a conversation with someone present in the court apart from court staff outside of voir dire, or that any juror would have had a conversation with any person involved in the case inside the courtroom without drawing the attention of the court or counsel.

The judge did not abuse his discretion. Aside from the fact there was nothing in the record to support defendant's concerns, he raised those concerns after the fact, depriving the trial judge of the ability to intervene and instruct the jury accordingly.

IV.

Defendant argues certain evidence presented at trial was highly prejudicial. We typically defer to a trial court's evidentiary ruling in the absence of an abuse of discretion "because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v.

42

Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). The trial court's rulings are not disturbed unless "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Where, as here, there is no objection made at trial, the issue is reviewed for plain error. R. 2:10-2.

## A.

Defendant alleges the trial judge improperly admitted lay opinion testimony regarding the surveillance video and Wormley's credibility. The testimony about the surveillance video was prejudicial because Detective Burrell said it showed defendant engaging in unlawful activity and corroborated Wormley's testimony. Defendant asserts this improperly bolstered Wormley's credibility, which was a decision for the jury to make.

A lay witness may give an opinion if it is rationally based on their perception, and the opinion will assist the jury in understanding the witness' testimony or determining a fact in issue. N.J.R.E. 701. Witness perception "rests on the acquisition of knowledge through use of one's sense of . . . sight." State v. Singh, 245 N.J. 1, 14 (2021) (quoting State v. McLean, 205 N.J. 438, 457 (2011)). "Courts in New Jersey have permitted police officers to testify as

lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary."  State v. LaBrutto, 114 N.J. 187, 198 (1989).

In McLean, our Supreme Court held an officer could not characterize a series of events he observed as a drug transaction because that was for the jury to decide.  205 N.J. at 461.  Conversely, the Court found an officer's lay opinion showing clothing on a suspect captured on surveillance footage was like an item of clothing worn by a defendant on the night of arrest was not plain error, even if the item in question was admitted into evidence, enabling the jury to form its own opinion.  Singh, 245 N.J. at 19-20.  The Singh Court distinguished McLean, because in Singh the detective did not say the item in question was the same as what defendant was wearing at the time of arrest and testified only to the similarity.  Id. at 20.

The Court has ruled an investigator who reviews surveillance video or other video recordings may narrate the video "[b]y drawing attention to key details that a jury might otherwise overlook" without violating N.J.R.E. 701. State v. Watson, 254 N.J. 558, 569 (2023).  Investigators must give "focused responses to specific questions" and "may not comment on facts that are reasonably in dispute, which should be left for the jury to decide; and they

should not offer testimony based on inferences drawn from other evidence." Ibid.; see also State v. Allen, 254 N.J. 530, 548-49 (2023) (finding a detective's testimony proper where it explained his investigation of the crime scene but finding the detective's conclusions regarding the defendant's actions improper).

A witness may not opine on the credibility of another witness, because "credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." State v. Frisby, 174 N.J. 583, 595 (2002) (quoting State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991), aff'd, 130 N.J. 554 (1993)). This is especially true when the witness is a police officer, since juries "may be inclined to accord special respect to such a witness." Ibid. (quoting Neno v. Clinton, 167 N.J. 573, 586-87 (2001)). The jury decides what weight to give to a witness's testimony. State v. Lazo, 209 N.J. 9, 24 (2012) (citing State v. Farrow, 61 N.J. 434, 451 (1972)).

Detective Burrell testified that once he received a statement from Wormley and Gibson, he "had to corroborate their statement by going to the location that they said they went to during the course of the day and pull video footage and knock on doors, talk to people to see if they observed them in that location." He described the various locations to which he or another detective

went to try to retrieve the video footage, the videos they were able to retrieve, and whether the timestamps on the videos were accurate.

The part of Detective Burrell's testimony defendant claims was reversible error was the following colloquy during his re-direct examination:

> Q: Okay. And in addition to [Wormley] identifying people in his vehicle, he told you the locations he had been at, correct?
>
> A: That's correct, sir.
>
> Q: And you also pulled video surveillance footage from those areas?
>
> A: Yes.
>
> Q: And the information he told you during his statement was corroborated by the surveillance videos.
>
> A: Yes, sir.

The prosecutor then continued to question the detective about the investigation, asking if he had identified or spoken with individuals mentioned by Gibson in her statement.

We discern no prejudicial error. It is clear from the context that Detective Burrell was describing the investigation, and the process he used in attempting to identify Little Bro and any other witnesses to the crime. He had testified he was "trying to find out . . . [if Wormley's] vehicle [was] involved, was he driving

his vehicle that night, who was in his vehicle that night," and whether Wormley was involved in the shooting or not. The detective sought out the surveillance footage based on Wormley's statement and found it matched what Wormley had told him. He did not opine on defendant's guilt or Wormley's credibility beyond the fact the videos show his Jeep at the places and times Wormley had stated.

The jury was instructed it was the sole arbiter of credibility and instructed about how to assess it. We presume it followed the judge's instructions. The jury was shown the surveillance videos of Wormley's vehicle and heard his testimony regarding the Jeep's path that night. They were able to come to their own conclusions about whether the videos corroborated Wormley's testimony independent of Detective Burrell's testimony.

## B.

Defendant argues the State elicited improper lay opinion and a legal conclusion from Wormley when he testified "I guess there was a robbery taking place." This testimony was prejudicial because Wormley did not hear defendant or Little Bro discussing the alleged robbery and did not see them with the robbery proceeds.

A witness may testify if they possess "personal knowledge of the matter." N.J.R.E. 602. Lay witnesses may also offer an opinion if it "is rationally based

47

on the witness' perception." N.J.R.E. 701(a). An opinion should not be excluded simply "because it embraces an ultimate issue to be decided by the trier of fact." N.J.R.E. 704. Lay witnesses may opine on "matters of . . . observation." State v. Johnson, 120 N.J. 263, 294 (1990) (citing LaBrutto, 114 N.J. at 197).

For instance, lay opinion may be offered to prove a defendant was operating a vehicle while under the influence of alcohol. State v. Bealor, 187 N.J. 574, 585 (2006). A witness may use words such as "stalking" and "harassment" not to express whether a defendant's actions constituted such crimes but rather the witness's "subjective state of mind placed in layman's terms." State v. B.A., 458 N.J. Super. 391, 414-15 (App. Div. 2019). Cross-examination is an effective means of challenging a witness in cases that rest on the observations and perceptions of a witness. State v. Garcia, 255 N.J. Super. 459, 466 (App. Div. 1992).

Pursuant to these principles, we conclude Wormley's testimony was proper. Wormley described his state of mind when both defendant and Little Bro exited his Jeep and approached the Honda, and defendant began rummaging through it. When asked what happened next, he responded:

> After a couple seconds, there's a whole bunch of commotion. There's a girl in the street screaming. There's a couple of guys out there. After a couple of seconds, you know, I guess there was a robbery taking

place and as I am exiting . . . my vehicle, passenger side to get into the driver's side to get the hell out of there, I heard about four or five shots.

Wormley testimony about "a robbery taking place" was to explain why he exited the Jeep and went to the driver's side to flee the area. His testimony was based on his personal observation, including hearing shouting and commotion, defendant's rummaging through the Honda, and Little Bro's threatening behavior.

Defense counsel cross-examined Wormley to impeach him about why he believed there was a robbery happening. The defense elicited testimony that Wormley did not overhear plans or conversations between defendant and Little Bro about a robbery.

The jury was instructed it could consider a witness's "power of discernment, meaning [their] judgment or understanding." Therefore, not only was Wormley's testimony proper because it explained his conduct, the defense was able to attack his credibility by demonstrating why his impression there was a robbery taking place was untrue.

C.

Defendant asserts he was deprived of a fair trial because the jury saw photos showing him in handcuffs. Although the photos were introduced to show

defendant owned white sneakers like those in the surveillance video, the prejudice outweighed the relevance because the State could have proven the same fact through Detective Burrell's testimony and photos of the shoes without defendant wearing them.

Defendant also argues the jury should not have seen his arrest photos because they showed him in handcuffs and reminded the jury of his arrest and incarceration. Based on the photos, the jury assumed defendant was a criminal who was aware of Little Bro's plans, which prejudiced the outcome of the trial.

Evidence may be excluded if "its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury; or (b) . . . needless presentation of cumulative evidence." N.J.R.E. 403. Evidence has probative value when it "has a tendency 'to establish the proposition that it is offered to prove.'" State v. Burr, 195 N.J. 119, 127 (2008) (quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)). A party seeking to exclude evidence has the burden of showing that "the factors favoring exclusion substantially outweigh the probative value of the contested evidence." State v. Swint, 328 N.J. Super. 236, 253 (App. Div. 2000) (citing State v. Morton, 155 N.J. 383, 453 (1998)). "The mere possibility that evidence could

be prejudicial does not justify its exclusion." Ibid. (citing Morton, 155 N.J. at 453-54).

There are many reasons for the State to introduce photographs of a defendant at trial, but "[a]rrest photos raise particular concerns, though, because they can inject prejudice by suggesting a defendant has a prior criminal record." Lazo, 209 N.J. at 19. Accordingly, mug shots are typically "an impermissible reference to defendant's criminal record." State v. Harris, 156 N.J. 122, 173 (1998) (citing State v. Cribb, 281 N.J. Super. 156, 161-62 (App. Div. 1995)). Where a jury is already aware that a defendant was arrested and a mug shot existed, references to the mug shot are not considered error. Ibid. Any arrest photographs should be presented "in as neutral a form as possible." Lazo, 209 N.J. at 19 (quoting State v. Taplin, 230 N.J. Super. 95, 99 (App. Div. 1988)).

The State introduced five photos of defendant at trial without any objection from the defense. Detective Burrell testified all the photos were taken on the day of defendant's arrest. He explained two of the photos were of defendant in the interview room and three of them showed him wearing the sneakers. The sneakers were also admitted into evidence. Wormley had already testified that in 2019, defendant had a "low haircut[,]" which was different than the hairstyle he had at trial.

The State used the photographs to show defendant's appearance was similar to how he looked when he was arrested and to show defendant on the surveillance videos in "clearly distinct clothing." The photos of the sneakers corroborated the surveillance footage showing the individual who exited the Jeep's driver's side was wearing white sneakers. And the photos of defendant showed he had a "low haircut" when he was arrested.

None of the photos depicted defendant in handcuffs or indicated they were taken at a police station. The jury already knew from Detective Burrell's testimony that defendant was arrested on May 8, 2019. For these reasons, the relevance of the photos outweighed their prejudicial effect.

V.

Defendant argues prosecutorial misconduct because the State played a zoomed-in version of the surveillance video during summations. There was no foundation laid for playing the video in this altered manner or an explanation of the level of magnification. Defendant asserts the State should have called a witness to explain the zoomed-in video did not distort or otherwise render it unreliable. He claims the jury was influenced by the zoomed-in video because it convicted him after reviewing it many times during deliberations.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995)). A reviewing court should only reverse on the grounds of prosecutorial misconduct if such misconduct "was so egregious that it deprived the defendant of a fair trial." Id. at 83 (citing, among others, State v. Ramseur, 106 N.J. 123, 322 (1987)). A defendant's failure to object at the time the statements are made suggests the remarks were not deemed prejudicial at the time and deprives the court of the opportunity to take any curative action. Id. at 84 (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997)). A trial court also has broad discretion in controlling playbacks of video for the jury. State v. A.R., 213 N.J. 542, 555 (2013) (citing State v. Miller, 205 N.J. 109, 122-23 (2011)).

Evidence must be authenticated or identified by presenting "evidence sufficient to support a finding that the item is what its proponent claims." N.J.R.E. 901. The evidence's "probative value must not be offset by undue prejudice, unfair surprise, . . . or possible confusion of issues due to the introduction of collateral matters." Rodd v. Raritan Radiologic Assocs., P.A.,

373 N.J. Super. 154, 165-66 (App. Div. 2004) (citing Balian v. Gen. Motors, 121 N.J. Super. 118, 127 (App. Div. 1972)).

We have observed there has been an "explosive growth in the number of surveillance cameras in operation," and many investigations now "piece together recordings made by multiple cameras at different locations" which essentially allow detectives to track a person or vehicle's path to "an ultimate destination." State v. Watson, 472 N.J. Super. 381, 472, rev. on other grounds, 254 N.J. 558 (2023). "The power of a video of contemporaneously recorded events at the crime scene can hardly be disputed. Indeed, it 'enhance[s] a . . . juror's assessment of credibility by providing a more complete picture of what occurred." State v. Garcia, 245 N.J. 412, 431-32 (2021) (alteration in original) (quoting State v. Cole, 229 N.J. 430, 450-51 (2017)).

Video that has been admitted into evidence may be played during summations. State v. McNeil-Thomas, 238 N.J. 256, 261 (2019). Videos may also be replayed for the jury, since "jurors cannot be expected to have perfect recall of every bit of evidence introduced during the trial." Id. at 273 (quoting Miller, 205 N.J. at 120). A jury's request to review evidence is "a clear sign that the evidence sought is important to the deliberative process." Miller, 205 N.J. at 120.

In Watson, we were not "aware of any rule that would categorically prevent a prosecutor, subject to the trial judge's approval and proper authentication, from presenting an augmented version of the video or screenshot," including zoomed-in portions of a recorded image. 472 N.J. Super. at 461 n.30. We found little difference "between augmentation accomplished by creating and introducing a new enhanced video exhibit and augmentation accomplished instead by allowing a witness to verbally 'zoom in' on a specific image depicted within the frame of film on display." Ibid. (emphasis omitted). A lay witness can explain simple adjustments made to videos regarding the speed of a video, creating a composite video, taking a screenshot, or enlarging a photo from a video, but where "more elaborate forensic techniques" are used, an expert witness should testify regarding the techniques, consistent with the requirements under Rule 702. Id. at 606.

In Boland v. Dolan, our Supreme Court found a jury's use of a magnifying glass permissible because it "only highlighted or illustrated evidence properly admitted or testimony of witnesses properly allowed during the trial," and the parties, counsel, and the jury knew about the possible use of the magnifying glass early in the trial. 140 N.J. 174, 187-88 (1995). The use of a magnifying glass "did not constitute new evidence." Id. at 188. Expert testimony was not

required to explain magnifying glasses to the jury because "[t]he fact that a magnifying glass is no longer used daily by the average person does not make it a highly complex scientific instrument." Id. at 189.

Other courts have found zooming in of videos or photographs akin to using a magnifying glass. See, e.g., People v. Ashe, 174 N.Y.S.3d 509, 516-17 (App. Div. 2022) (finding a jury was allowed to use the "zoom" function on videos since it was the equivalent of using a magnifying glass and there was no evidence the video was altered by zooming).

Very recently, our Supreme Court affirmed our ruling upholding the permissibility of replaying a video for a jury at a modified, slow-motion speed with intermittent pauses. State v. Knight, 259 N.J. 407, 409-10 (2024) (Knight II). Subject to N.J.R.E. 403, we held a trial court considering the admission of this type of evidence should consider among other things whether the evidence would assist jurors in understanding "pertinent events" and disputed facts; the evidence was played back "in open court under the [trial] judge's supervision . . . in the presence of counsel"; and whether it could help resolve disputed identification issues or "disputed issues of intentionality." State v. Knight, 477 N.J. Super. 400, 425-26 (App. Div. 2023). The Supreme Court endorsed these "non-exclusive factors" and regarding the seminal issue held:

> Watching a video in slow motion is a commonplace method of playing a video that is not beyond the ken of an average juror. Pushing a button to play a video at a speed slower than normal to assist the jury in viewing the difficult-to-perceive recording here was not an alteration or distortion of the video. It was the same exact video – simply played in slow motion.
>
> [Knight II, 259 N.J. at 410.]

The facts here uniquely marry the magnifying glass in Boland with the video technology in Knight. The zoomed-in video was presented without objection for the first time during the prosecutor's summation. According to the prosecutor, it showed a person, "[c]learly the defendant," speaking with a group of men on Twentieth Street. Another video was played, showing Little Bro getting out of the Jeep and approaching the Honda, and the prosecutor said he "zoom[ed] in here right to the vehicle, because, ladies and gentlemen, I want no speculation. I want you to be able to see exactly what happened that night."

During deliberations, the jury asked to see the zoomed-in video "when Little Bro arrives at [the] Honda until Little Bro and [defendant] leave [the] Honda." The judge allowed the video to be played for the jury in the presence of counsel and the court, with no objection.

The use of the zoomed-in video was not reversible error. The video, albeit without zoom, was already in evidence and was relevant to the jury's task of

resolving the factual issues. The playbacks occurred in open court under the judge's supervision and in the presence of counsel. There is no indication the zoomed-in video altered or distorted the original.

The prosecutor used the zoomed-in video to show Little Bro "going directly to the driver's side of the vehicle and pulling somebody back. Look at their hands up, backing away. Here comes the defendant, running to his aid. He knows what's going on at this point." Pursuant to Wormley's descriptions of the men, the prosecutor used the video to show these were the same individuals seen in earlier surveillance videos. The prosecutor also used the video to show defendant was not buying pain killers, but there to kill Branch. The video helped the jury resolved "pertinent events" and "disputed issues of intentionality." Knight, 477 N.J. Super. at 425-26.

Although Detective Burrell did not testify to the zoomed-in video, he authenticated the original video and described the process of retrieving surveillance from various areas. Because there is no evidence the zoomed-in video distorted or altered the video, it did not require further authentication or a witness to explain the zooming-in process. Indeed, we noted that with the ubiquity of smart phones, the ability to zoom in or out is not so esoteric or scientific to be beyond the ken of the average juror.

A-2029-22

VI.

Defendant asserts the trial judge did not properly consider the aggravating and mitigating factors before imposing a forty-five-year extended NERA sentence.  He claims a term of thirty years would have been sufficient because he will be in his sixties when he is released, and the risk of recidivism would be extremely low.  In addition to not considering his age, the judge erred by considering defendant's juvenile record.  The judge also did not consider the hardship incarceration would cause because defendant's children, siblings, nieces, and nephews rely on him for support.

The abuse of discretion standard applies to our review of a sentence.  State v. Robinson, 217 N.J. 594, 603 (2014).  We will affirm a sentence "unless:  (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'"  State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

A sentencing court "may consider a juvenile record even if the charges did not result in convictions."  State v. Torres, 313 N.J. Super. 129, 162 (App. Div. 1998) (citing State v. Tanksley, 245 N.J. Super. 390, 396 (App. Div. 1991)).

The court must be presented with "the fullest information possible concerning the defendant's life and characteristics." State v. Marzolf, 79 N.J. 167, 176-77 (1979) (quoting Williams v. New York, 337 U.S. 241, 247 (1949)). A defendant's "background, including prior arrests or juvenile offenses, should be fully exposed, even though no convictions have ensued." Id. at 177 (citing, among others, State v. Sayko, 71 N.J. 8, 13 (1976)). This is especially true "if the juvenile adjudications are relatively recent, voluminous, or severe." State v. C.W., 449 N.J. Super. 231, 259 (App. Div. 2017) (citing Torres, 313 N.J. Super. at 162, and State v. Phillips, 176 N.J. Super. 495, 502 (App. Div. 1980)). However, the court should not afford the same weight to juvenile offenses as prior adult convictions. Id. at 260.

In addition to these factors, "age is doubtlessly among the information that courts should consider when calibrating a fair sentence." State v. Torres, 246 N.J. 246, 273 (2021) (Torres II). However, "age alone cannot drive the outcome," and a defendant "cannot rely on age to avoid an otherwise appropriate sentence." Ibid.

The trial judge found aggravating factor three, the risk that the defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, the extent of defendant's prior criminal record and the seriousness of the offense for which he

had been convicted, N.J.S.A. 2C:44-1(a)(6); and nine, N.J.S.A. 2C:44-1(a)(9), the need to deter the defendant and others from violating the law. The judge rejected defendant's arguments for mitigating factor eight, N.J.S.A. 2C:44-1(b)(8), that defendant's conduct was the result of circumstances unlikely to occur; and factor nine, N.J.S.A. 2C:44-1(b)(9), that defendant is unlikely to commit another offense, noting defendant was on parole at the time of the current offense and had a prior criminal history.

The judge noted he received three letters submitted on behalf of defendant and considered defendant's allocution, and comments from his family members and the victim's sister. Defendant's brother and sister asked the court to show leniency because they both needed him. However, neither indicated they relied on him financially or materially and would face a hardship in those respects. Defense counsel informed the judge defendant had four children, between the ages of fifteen and eleven, but the record does not show he lived with his children or supported them.

Although the defense sentencing brief noted defendant had previously helped care for his younger siblings, helped his uncle recover from a stroke, and led his partner's children "away from the lure of the streets to be a productive member of society," there was no indication his family presently relied on him

61

and the defense brief did not expressly seek mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), that imprisonment would entail an excessive hardship to defendant or his dependents. Although the defense sentencing brief expressed remorse on defendant's behalf, and during allocution defendant said he was "deeply sorry" for the Branch family's loss, he denied any responsibility for his crimes.

The judge considered defendant's record, noting that he was thirty-five years old, and as a juvenile, had ten petitions filed for offenses, "one of which was waived up as an adult. He was adjudicated delinquent on three occasions, had one diversion and was on probation on two occasions." Defendant had four prior indictable convictions, including convictions for second-degree manslaughter and weapons offenses in 2016, and two drug-related offenses in 2020. This case involved defendant's fifth, sixth, and seventh indictable convictions as an adult.

The sentence was not erroneous. The judge was permitted to use defendant's criminal history, including juvenile offenses, when considering the appropriate sentence. His findings show he accorded more weight to defendant's adult convictions by specifically reciting the adult offenses and noting the existence of the juvenile adjudications.

The fact defendant received a forty-five-year NERA sentence is well supported by the facts and circumstances in the record. We are unconvinced a thirty-year sentence was more appropriate because defendant would be released at an age where he could not re-offend. Age is but one factor "in the matrix of information assessed by a sentencing court," and the main concern should be the overall fairness of a sentence. Torres II, 246 N.J. at 274.

The trial judge appropriately balanced the aggravating and mitigating factors. He found "the aggravating factors preponderate over the mitigating factors. This preponderance of aggravating factors weighs in favor of a custodial term higher than the presumptive term." These findings are supported by the record. Defendant's sentence does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division